We have an unusual calendar today. The last case you will note is American Civil Liberties Union versus the Central Intelligence Agency. At the conclusion of the other part of the calendar, that is the oral arguments, the American Civil Liberties Union will argue here, and then the bench will hear  ex parte in the Roe v. Group. We will not return after we hear that argument. So let me turn now to the calendar, Thomas Edwards v. the Sequoia Fund. Thank you. Good morning. Good morning, your honors. If it pleases the court, Felicia Ennis, for the appellants Thomas Edwards and Michael Fortune individually on behalf of others similarly situated. Your honors, the issue on this appeal is whether the appellants who are shareholders in appellee Sequoia Fund, Inc. pled the existence and breach of an implied contract based on Sequoia's adoption of a fundamental investment restriction not to concentrate more than 25% of its net assets in any one industry. Do you agree that if the excess over 25% occurred as the result, well, first of all, you agree, do you not, that the occurrence was the result of an increase in value in Valley and not the purchase of more shares? There's no factual dispute about that. Correct, your honor. So do you agree that if the 1983 release provision that says that if that occurs, if an excessive 25% occurs as a result of an increase in value, the fund does not need to sell off shares to get back down to 25%. Do you agree that if that is now, remains the governing law notwithstanding what was said in the 1988 release, then you don't have a case? Do you agree with that? We agree that that is what was stated in the 1983 release. What I'm asking you is, do you agree that if the 1983 release continues to be effective, and you argue that it's not because you argue that it was countermanded by 1988, do you agree that if the 1983 language continues to be effective, that's the end of the case? Correct, your honor. If the 1983 language remains in effect, it does provide that exception to the 25% benchmark in the SEC's guidance that if the appreciation and value of the assets was the result of exceeding the benchmark, then the excess would not have to be sold off. The whole issue for us is whether the 1983 provisions were abrogated by the 1998 release so that the 1983 provisions are no longer effective law. Is that right? Or whether a reasonable shareholder reading those provisions would take it to mean just that. And it is our contention that if a shareholder were to read the 1998 release, which is the current release, that the shareholder would find no such language or exception with respect to that 25% threshold. You're arguing that a shareholder's misunderstanding of the law would give you a cause of action if we conclude that the law is that there was no obligation to sell because the increase occurred, the passage of 25% occurred as a result of an increase in value. Still you have a claim just because a shareholder might misunderstand the law, reading the law might not get it right? No, Your Honor. We're saying that with respect to this SEC guidance, that if in fact a shareholder were to read it, it's plausible that the shareholder would have understood the SEC's not republishing this guide 19 from the earlier. That was my question.  might misunderstand the law, the shareholder gets the benefit of what the shareholder understood the law to be rather than what the law is? Well, Your Honor, first of all, we argue, and I think the SEC makes it clear that this was not an SEC regulation that we were discussing the interpretation of. This was an SEC guidance that doesn't rise to that level. And as an interpretive guidance, what it is assisting with is how to fill out a form. And that's the form N1A registration statement. So what we are suggesting, Your Honor, is that if a shareholder were to read this interpretive guidance, the interpretive guidance itself in 1998 states that it was no longer publishing those guides from the earlier 1983 release, and that as a result, those earlier guides would no longer have any application to the manner in which the SEC interpreted what was industry concentration. And as far as the 1998 release and going forward, how the SEC interprets industry concentration is by using simply this 25% benchmark, which the SEC contends was a reasonable level to gauge not only the concentration in the industry, but then the- I think one of the questions is, even assuming that the concentration policy creates a contract, is there a breach when the increase is a result of, it's a passive increase, as opposed to investing more dollars? Is there a breach? We contend there is a breach, Your Honor, because as the SEC advises in its guidance- And you contend that there's a breach because there was an obligation to sell to get below the 25%, or how is there a breach if they haven't done anything in terms of additional investing? Well, there was a breach because they were supposed to be gauging their level of industry concentration. They should have rebalanced, and if that rebalancing involves selling off, then that's what they should have done. But the point of this industry concentration restriction is to reduce risk to shareholders. So doing nothing, we contend then, is not the option, and not giving full effect to the intent of this particular industry concentration policy. And if they had sold some of the Valiant shares, their loss would have been lighter. Wouldn't it have been less of a loss if they had sold some of those shares? We agree- When they went over 25%. We contend that in our complaint, Your Honor, and we say that the shareholders of this fund were injured because Sequoia failed to take any action when their concentration in the healthcare industry exceeded the 25% benchmark, which is the benchmark that the SEC uses to gauge the level of risk that a fund is investing in in terms of a specific industry. The district court didn't decide that this was a contract, but assumed it was one for the sake of deciding the case. If we wanted to get to the merits, that is your argument, do we have to find that this is a contract, and would we be the first circuit to do so? You would not be the first circuit, Your Honor. There was an earlier decision in 2015 in the Ninth Circuit where the Ninth Circuit did find the existence of a contractual obligation based on a similar industry concentration restriction, and that is in the Northstar case versus the Charles Schwab Fund. And in that case, the Ninth Circuit analyzed the issue of the undertaking by the fund to determine that the restrictions that the fund placed on itself when it adopted this industry concentration restriction actually created the contractual obligation, and implicit in that obligation would be that it would manage its fund consistent with its policy, and the failure to do so in that case gave rise to a breach of contract. And in the Northstar case, the Ninth Circuit also relied on an analogous case that was the Supreme Court decision in the trustees of Dartmouth, where the Northstar Court drew an analogous situation because in that case, there was an adoption of a charter for the college, and in that charter, it stated that if you donate to this college, we will use your donation for charitable purposes. And the analogy that the Ninth Circuit drew from that is that this is creating a contractual obligation that based on these restrictions in the fund's ability to manage itself, there's an implicit obligation there and a promise to shareholders that the fund would manage itself pursuant to those stated restrictions, which includes a shareholder vote necessary to change that policy. And it is those restrictions that the Ninth Circuit stated gave rise to the contractual obligation in that case, Your Honor. So do I understand correctly that your position is on the legal question, your position is that if there was sufficient ambiguity and possible confusion about the meaning of the 1998 release so that a shareholder could have reasonably misunderstood it or could have understood it to mean that the provisions of the 1983 release about no obligation to sell when the excess results is passive and results from a rise in prices, if that circumstance exists, then you have a good claim even if we conclude that the 1998 release did not abrogate that provision and even if the SEC were to come and tell us, no, the 1983 language remained in effect, we had no intention to abrogate it. But you contend that the governing issue is whether a shareholder might have understood 1998 to abrogate 1983. Am I understanding your position correctly? Well, Your Honor, we contend that if there is an ambiguity concerning how the guidance should apply to the 25% benchmark, then that ambiguity shouldn't have been decided on a motion to dismiss. Although the shareholders contend in this case that the 1998 release expresses in its plain language that in footnote 214, that the guides from the earlier 1983 release no longer apply to registration forms that are filled out under the amended registrations from the 1998 release. But am I correct that you're saying that the governing issue is whether a shareholder could have reasonably understood the 1983 language to be superseded, not whether the SEC so intended or whether we would interpret it as having been superseded? Correct, Your Honor. Thank you. Your time has expired, but you have reserved three minutes for rebuttal. Thank you, counsel. We'll hear from Sequoia. Good morning, Your Honors. Robert Skinner with Amy Roy from Roots and Gray on behalf of the Sequoia Fund. Let me turn directly to the question of why the 1983 guidance regarding the application of the 25% test was not rescinded in 1998 as the plaintiffs allege. The 1983 guidance was part of the accompanying release by the SEC when it first enacted Form N1A, which is the form for the registration statement for mutual funds. One of the requirements in Form N1A was the disclosure of the fund's concentration policy, and the SEC gave guidance in that release saying that we think 25% is an appropriate benchmark and that you don't exceed that benchmark by passive increases in value. 15 years later in 1998, the SEC issued an amended Form N1A and also issued, at the same time, accompanying instructions just as it had done in 1983. Because Form N1A as amended replaced Form N1A from 1983, the instructions from 1998 replaced the instructions from 1983. However, in two places in those instructions, as published in the Federal Register, the SEC said Form N1A as amended incorporates certain disclosure requirements from the guidelines to current Form N1A. Those guidelines include the so-called Guide 19 that related to concentration. So it's flagging in the 1998 release we're incorporating certain of the old guidelines from 1983 into the new Form N1A. And that Guide 19 is the one that set forth both the 25% threshold figure and the test for how to apply it, that is the active versus passive distinction. Then in the specific reference in the later 1998 instructions to the concentration issue, what the Court said is, the Commission's staff has taken the position for purposes of the concentration requirement that a fund investing more than 25% of its assets in an industry is concentrating in that industry and cited the Guide 19. That is the 1983 guidance regarding both the 25% test and how to apply it. The SEC then went on to say in the very next sentence in the 1998 guidance, the proposed amendments incorporated this percentage test into Form N1A. In other words, it cites the Guide 19 which has both the threshold and the way to apply it, active versus passive, and then goes on to say in the next sentence, the proposed amendments incorporated this percentage test into the new Form N1A. We think it is very clear that the guidance regarding how to apply the test, which is not an exception as the plaintiffs are trying to characterize it, it is guidance as to how the test is to be applied. We think it's very clear the staff intended to continue that guidance, and indeed the plaintiffs have not and cannot point to any statement since 1983 that the staff or the commission has ever made suggesting that they switched from an active investment only test to a passive test that the plaintiffs are now urging. There's never been an enforcement action brought based on a passive exceedance. There's never been any suggestion that they silently switched. Let me ask you, according to my exchange with your adversary counsel, your adversary counsel's argument would be all of what you said is irrelevant. It's irrelevant whether we conclude, even if we conclude that everything you said is absolutely correct, if a layperson shareholder could have looked at all these documents and understood them as meaning that the 1998 release supersedes the provisions that you rely on about the passive increase, that should be the test. That is the test, and you are in violation. Even if we agree with everything you just explained to us, it misses the point because the point is not did the SEC intend to abrogate the 1983 passive increase provision, but could a shareholder, a layperson shareholder reading those provisions have understood that? That's her argument. What do you say to that? I think that's incorrect for at least a couple of reasons, Your Honor. One is, of course, it presumes that this is a contract and therefore that the contract interpretation principles of a reasonable reader of the contract apply. Second, they've asserted an implied contract, not an express contract, an implied contract whose terms come from the conduct of the parties. I don't know that they can have it both ways and suggest that the ambiguity provisions of the contract law apply to an implied contract. I think the plaintiff's argument doesn't, as I understand it, the plaintiff's argument doesn't rely on its being a contract. I may be wrong about that. I thought there was an argument that it was a violation of law, giving rise to a claim to concentrate when you are unregistered and are under a commitment not to concentrate. If the question, therefore, is whether this is simply a violation of law in that it is a violation of the policy stated in the prospectus, I think there is no basis in law to suggest that a shareholder's reading of the SEC's guidance, which in fact defines the policy, can give rise to a violation of law by the fund. But if we accept the plaintiff's argument that a lay person could have read this to mean that the 1983 provision was abrogated, if we accept that argument, does that mean we need to rule on the question whether there was a contract? I think that there, well, no. Actually, yes, I think you would need to. I mean, if, in other words, the contract, the alleged contractual language treats as the concentration policy, the definition as defined by interpretation or guidance of the SEC. You know, I would disagree with the premise that the lay person's reading can define what the SEC's guidance actually is or that that is the lens through which it should be viewed. But in the event that the court could find it's plausible that that is the reading and therefore that somehow the test was switched to a passive test, the court might then need to conclude that it needs to get to the contract formation question. And if Your Honor would like, I can turn to the question of why it is that the Ninth Circuit's decision in North Star is both distinguishable on its facts and also incorrectly ruled. Significantly, Your Honor, the implied contract found by the North Star panel, the majority of the North Star panel, a two-one decision, was based on a couple of facts that do not apply here and are quite important. One is that that fund was a Massachusetts business trust that was founded by an agreement and a declaration of trust that by its terms made the shareholders parties to the agreement. So there was already a contract existing between the shareholders and the fund by virtue of that declaration of trust. The court then held that by having the shareholders vote to implement the concentration policy there, the shareholders then by vote entered into a contract with the fund limiting the investment authority of the fund that had been set forth in the original contract between the parties and the fund. Neither of those facts upon which the court based its finding of an implied contract is here. This is a Maryland corporation with no similar declaration of trust. The shareholders did not vote to implement these policies. It was a policy implemented unilaterally by the fund and simply described in the mandatory disclosure. They did not have to vote on the policy. They viewed the policy binding as it existed. I think that the key distinction here, Your Honor, is indeed the policy is binding and it is enforceable, simply not as a matter of contract. And the case law, other than the North Star case- Who would enforce it? It can be enforced a number of ways, Your Honor. A violation can be enforced by the SEC, an enforcement action. There are securities claims- Has the SEC ever taken an enforcement action on concentration policy? Yes. The Schwab case, in the very fund, on the very facts at issue in the Charles Schwab case that we cited in our brief, private shareholders brought suit. Their breach of contract claim was thrown out. The shareholders. Has the SEC ever undertaken an enforcement- In that case. Yes, Your Honor, in that case. There were shareholder claims and the SEC enforcement action. Schwab settled an enforcement action on very similar facts, having to do with concentration of mortgage-backed securities in this particular fund. And Judge Alsup in the Northern District, in a case that I think is most analogous to this one, of any case cited by either party, and I would refer the court to it, Judge Alsup tossed out the breach of contract claim, but let the federal securities law claims go forward because on the theory that the fact that the policy, the concentration policy had not been followed, was, left the prospectus materially misleading, and therefore gave a rise to an action under the 33 Act. That was not a contract case. That was different. It was a contract case. They also asserted a contract action. And Judge Alsup said, following other Ninth Circuit authority, the McKesson case said an offer of securities in a securities offering document is a much broader concept than a contractual offer, and they are different things. An offer in a securities offering is a description of the product. The contract claim was dismissed. The contract claim was dismissed in the Charles Schwab case by Judge Alsup. Securities law claims went forward. And I think this is a great example of the fact that if there is something in the prospectus that does not describe accurately how the fund is run, that gives rise to a securities claim. It does not give rise to a contract claim, and importantly, what other courts have consistently found is that by describing how a corporate action is taken, you are making an offer of securities, but that is not tantamount to offering a binding contract. It is not an offer from which you are seeking a responsive action or offer in the basic quid pro quo of a common law contract. The Dartmouth case, Your Honor, is importantly misrelied upon by the Ninth Circuit. In the majority holding of the Dartmouth case from 1819, Chief Justice Marshall found that the charter founding Dartmouth College was a private contract between the Crown and the trustees. Justice Story, in his concurring opinion, relied upon by the North Star case and the plaintiffs. He, in his concurring opinion, said, I believe it is also the case that there is an implied contract between the charitable corporation and its future donors, but that was not the holding of the court. That is not the law of charitable corporations today, and it's certainly not the law of corporate offerings. That is just, that is, you know, frankly musings, if you will, in a concurring opinion by Justice Story that has not become the law of the land and was misrelied upon by the Ninth Circuit. Similarly, the Ninth Circuit relied upon the Lapidus versus Hecht case, but that was a case that did not involve a claimed contract. It involved whether or not a statutory action under the 1940 Act was direct or derivative. The plaintiffs alleged a contractual right to voting, but the court did not find any contractual right. It simply referred to the plaintiff's allegations that their voting right was contractual in nature. The court did not find that. Thank you, Your Honor. Thank you. Counsel, you're reserved three minutes for rebuttal. Your Honors, first I just want to clarify that the plaintiff's claim in its complaint is based on a breach of contract and- It's not a securities claim. It is not a securities claim, Your Honor. Is that a strategic decision that you made in bringing this lawsuit? Not that it was a strategic decision, but we believe that clearly this particular industry concentration restriction created a clear contractual obligation on the part of the fund to manage its fund based on its stated intentions. And with respect to my adversary's argument that Guide 19 was somehow incorporated into the 1998 release, I would simply draw Your Honor's attention to the incorporation by reference standard articulated by this court, both in the case of Continental Insurance Company and in Payne-Weber Inc. v. Bivic, which states that unless there's some unmistakable language of the intent to incorporate a document into another document, then the incorporation by reference must fail. And that is precisely what Sequoia would argue to this court. All we see in the 1998 release is a citation to a prior release issued by the SEC making reference to a 25% benchmark. What we do not see in the 1998 release is any other language that the SEC took from this prior release. And what the SEC makes clear in its 1998 release that what it is concerned about is gauging this level of industry concentration. It is not concerned how the fund reaches that level of concentration, whether by passive holding or active purchasing, but is this level of industry concentration is what is creating the risk for shareholders. And that's what the SEC focused on in its 1998 release. Concerning my adversary's argument that these types of contractual obligations are somehow shielded if they are published in a mandatory disclosure document, I think that argument was. Is there any language in the 1998 release that supports the assertion that a passive increase would trigger this? No, Your Honor. What I would refer the court's attention to is the specific language that follows the citation to guide 19 referenced by Sequoia in that what the SEC referenced when it adopted this 25% benchmark is, quote, that the commission continues to believe that 25% is an appropriate benchmark to gauge the level of investment concentration. Is there anything, either way, in the 1998 release that sheds light directly on whether the language or the concept from the 83 guidance was either retained or not retained? No specific language, Your Honor, but we would argue that that omission was intentional on the part of the SEC, since some of that language- What does that mean? It was intentional to leave it ambiguous? No, Your Honor. I think that when evaluating whether these 1983 guidances would have any forward effect on the newly amended registration statement, the SEC did give some consideration. What about the treatises? The treatises support the defendant's interpretation? Again, Your Honor, we've distinguished those treatises to the extent that they are reliant upon the release that, based on the language of the SEC, were no longer being published or are applicable to registration statements going forward, and that's the language that we rely on, Your Honor. With respect to my adversary's statement that these types of contractual obligations cannot form the basis of the obligation because they appear in a mandatory disclosure statement, again, we would submit that the Ninth Circuit squarely rejected that argument and also clarified its holding in the McKesson case relied upon by both Sequoia and the court below. Thank you, Your Honor. Thank you. Thank you both. Very lively argument. We'll reserve decision.